UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                  Plaintiff,

    v.

ROBERT JACKSON,

                  Defendant.

---

<u>REPORT & RECOMMENDATION</u>

21-CR-6119FPG

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Frank P. Geraci, Jr., United States District Judge, dated September 20, 2021, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 6).

On April 26, 2022, the grand jury returned a five-count superseding indictment against Robert Jackson.  (Docket # 24).  The first three counts of the indictment charge Jackson with unlawfully possessing with the intent to distribute certain Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  (*Id.*).  Specifically, Count One charges Jackson with possessing cocaine, Count Two charges him with possessing fentanyl, and Count Three charges him with possessing fentanyl, methamphetamine and 4-anilino-N-phenethyl-4-piperidine ("ANPP").  (*Id.*).  Count Four charges him with possession of firearms in furtherance of the drug trafficking crimes charged in Counts One, Two and Three, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i).  Count Five charges Jackson, as a convicted felon, with possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (*Id.*).

Currently pending before this Court for report and recommendation are Jackson's motions to dismiss and to suppress tangible evidence and statements.[1] (Docket ## 17, 32, 37). For the reasons discussed below, I recommend that the district court deny the motions to dismiss and to suppress tangible evidence and grant in part and deny in part the motion to suppress statements.

## FACTUAL BACKGROUND

On May 2, 2022, this Court held an evidentiary hearing on Jackson's motions to suppress (Docket ## 26, 28),[2] after which the parties submitted post-hearing submissions (Docket ## 32, 35, 37, 40). The government called three witnesses: New York State Parole ("NYS Parole") Officer Mark Richards, Parole Officer Scott Verbridge, and Rochester Police Department ("RPD") Officer Andrew Pepin. (Docket # 28).

## I.    Testimony of Richards

Richards testified that he had been employed as a NYS Parole officer for approximately six years. (Tr. 8). Richards described his duties as ensuring that the parolees

---

[1] Jackson filed several omnibus motions seeking other forms of relief, including an audibility hearing, bill of particulars, *Brady* material, disclosure of a witness list, discovery, Rule 404(b), 608 and 609 materials, *Jencks* material, preservation of rough notes, leave to file additional motions, and grand jury materials. (Docket # 17). Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on May 2, 2022. (Docket ## 26, 27, 28).

In his omnibus motions, Jackson also sought to suppress identification testimony and to dismiss the indictment for speedy trial violations. (Docket # 17 at ¶¶ 22-23, 52-54). Jackson withdrew the portion of the motion to dismiss based upon speedy trial grounds during the proceedings on March 31, 2022; in the subsequent May 2, 2022 proceedings, the Court confirmed the withdrawal. (Docket ## 21, 27, 28 at 118). With respect to the motion to suppress identification testimony, during the proceedings on May 2, 2022, the government represented that an identification proceeding had not been conducted. (Docket # 28 at 118-19). Accordingly, the Court recommends that the district court deny this motion as moot.

[2] The transcript of the May 2, 2022 hearing shall be referred to as "Tr. __." (Docket # 28).

whom he supervises comply with the terms of their conditions of release and assisting their reintegration into society by encouraging their participation in employment and programming. (Tr. 8-9, 24).

Richards testified that in October 2020 Jackson was paroled and assigned to him for supervision. (Tr. 11; Government's Exhibit ("G. Ex.") 1). Richards testified that Jackson was subject to standard and special conditions of release, and Richards had responsibility for supervising Jackson to ensure his compliance. (Tr. 16-19; G. Ex. 1). Jackson's release conditions required him to "permit [his] Parole Officer to visit [him] at [his] residence, . . . permit the search and inspection of [his] person, residence, and property, and . . . discuss any proposed changes in [his] residence, employment or program status with [his] Parole Officer." (Tr. 23; G. Ex. 1). The conditions also prohibited Jackson from possessing controlled substances, firearms, or deadly weapons. (G. Ex. 1). The special conditions of release further required Jackson to abide by a curfew and by any geographic restrictions established by his parole office. (G. Ex. 1). According to Richards, Jackson was also required to wear a GPS ankle monitor. (Tr. 27).

Richards testified that NYS Parole officers adhere to a written "Search and Seizure" directive, which permits officers to conduct a warrantless search of a parolee's residence if they have an "articulable reason" to conduct a search and the search is reasonably related to the performance of the parole officer's duties. (Tr. 41-43; G. Ex. 2). The directive defines "articulable reason" as "[a] reason based upon information which appears to be reliable and which results from: knowledge of specific facts by a [parole officer], observations by said [parole officer], communication from the parolee or from a family member of the parolee or from a member of the community or other informant, or from another government agency."

(Tr. 44; G. Ex. 2 at 2).  Prior to conducting a residence search, an officer is required to obtain

approval from a supervisor.  (Tr. 43; G. Ex. 2 at 3).  The policy also states that the decision to

conduct a search may arise when 1) the officer "reasonably believes that the parolee is violating

one or more conditions of his or her release"; 2) the officer "observes criminal or violative

conduct in progress"; 3) "[a]n informant has provided reliable information of criminal or

violative conduct"; 4) the parolee's "activities lead [the officer] to conclude that a search is in the

best interest of public safety"; 5) "[s]tatements or conduct of [the] parolee . . . alert the [officer]

to possible criminality"; or 6) there exists "[a] history of prior seizures."  (G. Ex. 2 at 2).

On December 23, 2020, NYS Parole was notified that Jackson's GPS ankle

monitor was in "master tamper," a monitoring signal indicating several possible problems,

including that it had broken or had become temporarily disconnected.  (Tr. 25-26, 61).  Richards

testified that standard protocol upon receiving a tamper alert was to investigate to determine the

source of the problem and to contact the parolee.  (Tr. 28).  He called Jackson, who informed

him that he was at a shopping center.  (Tr. 28, 59).  According to Richards, he recalled that the

location Jackson reported was consistent with the available GPS tracking information.  (Tr. 30,

60-61).

By the time Richards called Jackson, he had received another alert concerning

Jackson's GPS monitor.  (Tr. 28, 62).  This alert was for a "shielding event," indicating the

possibility that something had been done to the monitor to affect its transmissions or ability to be

located.  (Tr. 29).  Richards informed Jackson of the alerts and asked him to hold down the

button on the device in order to reset it.  (Tr. 30).  Shortly after that conversation, Richards's

workday ended, and he left the office for the evening.  (Tr. 30, 64).

When Richards arrived at his residence, he used his phone to check the status of Jackson's device in order to ensure that the reset had resolved the issue. (Tr. 31). At that time, the device apparently remained masked and, although it was not actually tracking Jackson's location, the device was pinging off certain cell towers that led Richards to believe that the tracker was traveling towards New York City. (Tr. 31).

At approximately 4:00 p.m. on December 23, 2020, another parole officer called Jackson and asked him to report to the parole office. (Tr. 31, 59). At that time, Jackson reported that he was still at a shopping center. (Tr. 31, 59). The parole office closed at 6:00 p.m. that day, and Jackson did not report before the office closed. (Tr 31, 59). Parole officers visited Jackson's parole-approved residence that evening after his curfew to conduct a home visit. (Tr. 33, 65-66). Jackson was not there, in violation of the curfew provision of his parole conditions. (Tr. 33, 45, 66, 68). At some point that evening, Jackson's GPS monitor began tracking again, but outside Jackson's parole-approved travel area. (Tr. 33). Based upon these events, Richards suspected that Jackson had traveled to New York City without permission. (Tr. 33-34).

The following morning Richards contacted Jackson and asked him asked to report to the parole office. (Tr. 31, 64-65). Jackson reported to the office around noon and was immediately detained, handcuffed, and searched. (Tr. 34, 37, 65, 77). Richards's supervisor, Senior Parole Officer Fuller, was present. (Tr. 38, 60). According to Richards, Fuller did not customarily attend standard office visits, but was present that day because the visit was part of an investigation concerning potential parole violations by Jackson. (Tr. 37, 60).

Richards asked Jackson about his travels the previous day and whether he had tampered with his GPS device. (Tr. 35, 38, 66). Richards informed Jackson that he was aware

that Jackson had traveled to New York City and asked him why he had traveled there without permission. (Tr. 35). Jackson responded that he had traveled to New York City in order to purchase a necklace for his girlfriend for Christmas and had not requested permission because he thought that his request would be denied. (Tr. 35). Richards asked Jackson what he had done to mask the GPS monitor, and Jackson told Richards that he put "[magnets] on the device to try and scramble the frequency on it." (Tr. 38-39). According to Richards, Jackson was "pretty forthcoming" during the interview, which was consistent with Richards's view that Jackson had "always . . . been . . . honest" during their interactions. (Tr. 38, 55, 67).

During this discussion, Jackson asked Fuller whether he was going to jail, and she responded that no determination had yet been made and that the officers were continuing to investigate Jackson's suspected parole violations. (Tr. 36-37, 39). Fuller informed Jackson that a determination would not be made until after the officers had all the pertinent information. (Tr. 37). Fuller then informed Jackson that they were going to travel to his parole-approved residence and conduct a search for possible contraband, which would assist the officers in making a determination. (Tr. 39). According to Richards, Jackson responded that a search would be "fine" and agreed that the officers could "go look at the residence." (Tr. 40).

Richards testified that Fuller directed that a search of the residence be conducted based upon the information they had gathered, including the GPS alerts and tracking information suggesting travel to the New York City area, Jackson's failure to report to the parole office on December 23, Jackson's curfew violation, and Jackson's admission to traveling out of the area without permission and attempting to mask the GPS device. (Tr. 41, 44-45, 67-69, 83). According to Richards, these circumstances presented an articulable reason to search the residence, the results of which would assist the parole officers in determining whether to proceed

with a formal violation. (Tr. 45-46). Richards testified that he did not have any specific information indicating that contraband might be located inside Jackson's residence but that, in his experience, investigation of suspicious behavior on the part of a parolee sometimes resulted in the discovery of contraband. (Tr. 46, 72-73). Richards indicated that they were not looking for any particular item. (Tr. 46). According to Richards, his duty was to investigate Jackson's conduct thoroughly in order to reach a conclusion about what had transpired. (Tr. 45-46).

Richards escorted Jackson outside the parole office and towards Richards's vehicle. (Tr. 47). While they were walking towards the vehicle, Richards observed Jackson's girlfriend in the parking lot. (Tr. 47-48, 70). According to Richards, Jackson shouted several times to his girlfriend that parole was going to their apartment. (Tr. 48, 70-71 (hereinafter, "Statement One")). Richards instructed Jackson to stop shouting to his girlfriend, but Jackson ignored that directive. (Tr. 48-49, 79-80). While traveling to the residence, Richards explained to Jackson that his statements to his girlfriend presented a safety risk to the officers. (Tr. 79-80).

According to Richards, when he and Jackson arrived at the residence, Jackson's girlfriend and several parole officers were already there. (Tr. 73). Richards escorted Jackson towards the apartment and arranged for him to be seated in a chair in the hallway just outside of the apartment's entrance. (Tr. 50, 74). Jackson remained handcuffed at that time and was not free to leave. (Tr. 74-75). Richards did not participate in the search of the residence, although he did enter the residence at some point and cursorily looked around the apartment. (Tr. 50). Richards remained with Jackson throughout the majority of the search. (Tr. 50-51, 55).

While Jackson was seated outside of the apartment, one of the parole officers exited the residence and informed Richards that she needed to contact RPD to request a patrol vehicle. (Tr. 51-52, 77-78). From this information, Richards deduced that something illegal had

been found during the search that required processing by RPD. (Tr. 51). At that point, Richards entered the apartment and observed two handguns, suspected narcotics, and a bundle of money. (Tr. 52, 56-57). Richards returned to Jackson but did not discuss his observations with him. (Tr. 54-55).

Sometime thereafter, Jackson began pushing the door open with his foot and disregarding directions. (Tr. 78). Richards relocated Jackson to Richards's vehicle, where Richards remained for the majority of the time, positioned either inside or just outside the vehicle; other officers occasionally relieved him. (Tr. 50-53, 78). According to Richards, he conversed with Jackson during this period, although he did not recall discussing Jackson's trip to New York City. (Tr. 53, 79). When an RPD vehicle arrived at the residence, Jackson asked Richards why the police had arrived. (Tr. 53-54, 84). Richards responded that the arrival of a marked police vehicle typically indicated the discovery of possible contraband, but that he did not definitively know in this instance. (Tr. 53-54, 79).

At some point thereafter, as Richards and Jackson continued to converse, Jackson looked at Richards and stated, "[Y]ou got me again, didn't you, Richards?" (Tr. 54, 84 (hereinafter, "Statement Two")). Richards testified that he had not asked Jackson any question immediately preceding this statement. (Tr. 54). Richards responded, "[W]hat do you mean?" (Tr. 54, 85-86). Jackson responded that Richards "got [him] again" and that whatever was found in the apartment was his and his girlfriend "had nothing to do with any of it." (Tr. 54 (hereinafter, "Statement Three")). Richards considered Jackson's statement "very important" because Jackson had not been informed of the evidence located inside the residence. (Tr. 54-55). According to Richards, the tone of their conversation remained casual. (Tr. 55, 86). Richards

8

testified that neither he, nor any of the other parole officers, advised Jackson of his *Miranda* rights.  (Tr. 55-56).

## II.    Testimony of Verbridge

Verbridge testified that he had been employed as a NYS Parole officer for approximately five years.  (Tr. 87-88).  On December 24, 2020, Verbridge was part of the search team assigned to conduct the search of Jackson's residence.  (Tr. 90).  Verbridge did not know Jackson and was not responsible for his supervision.  (Tr. 91-92).  According to Verbridge, he had been advised to conduct a compliance search of the residence to look for any items that would constitute a violation of Jackson's parole conditions.  (Tr. 90, 97, 103-105).  Verbridge did not recall receiving any instructions to look for any particular items, such as firearms or narcotics, but because the search was a compliance search, he understood that he should look for contraband, including firearms and narcotics.  (Tr. 90, 97, 103-105).

Verbridge participated in the search of the bedroom and the bedroom closet, both of which appeared to contain items belonging to Jackson and his girlfriend.  (Tr. 97-98, 100).  In the closet, he noticed a purse hanging from a hook on the inside of the door.  (Tr. 92, 101).  When Verbridge moved the purse, it felt heavy.  (Tr. 93, 98, 101).  Verbridge passed the bag to Parole Officer Masuccia, who was assisting with the search.  (Tr. 93, 102).  Masuccia removed several items from the bag, including two handguns, a green leafy substance, six rounds of ammunition, and several baggies containing a white powdery substance that Verbridge believed might be crack cocaine.  (Tr. 94, 96, 102).  Masuccia placed these items on the floor.  (Tr. 94, 105).  Masuccia also located a bundle of $100 bills in the bedroom nightstand.  (Tr. 95, 105).

Verbridge photographed the money and the items found inside the purse.  (Tr. 95-97, 105;

G. Ex. 4).


### III.    Pepin's Testimony and Body Camera Footage

Pepin testified that he had been employed as an RPD police officer since March

2016.  (Tr. 107).  Pepin was on duty on December 24, 2020, and received a broadcast from

dispatch that parole was requesting assistance at 100 Tremont Circle.  (Tr. 108).  Pepin

responded to that location and took custody of Jackson.  (Tr. 109).  Pepin testified that he was

equipped with a body-worn camera at the time.  (Tr. 110).  According to Pepin, he placed

Jackson into the back of his marked patrol vehicle and transported him to the Public Safety

Building.  (Tr. 109-10).  Pepin testified that he did not read Jackson his *Miranda* rights, nor did

he hear anyone else do so.  (Tr. 121).

Review of Pepin's body-worn camera footage depicts the following.  As Jackson

was seated in the back of Richards's vehicle, an officer began to remove shackles from his

ankles.  (Tr. 113; G. Ex. 4 at 0:00:08 – 0:00:42).  Jackson asked the officer whether he was

removing the shackles "for good," and the officer responded affirmatively.  (G. Ex. 4 at 0:00:42

– 0:00:47).  Jackson then asked the officer what was happening, and the officer responded that

Jackson was going to be transported to the Public Safety Building.  (G. Ex. 4 at 0:00:52 –

0:00:57).

The tone of the discussion between the officer and Jackson was conversational.

At one point, the officer asked Jackson whether he had any shoulder injuries, and Jackson

responded that he did.  (G. Ex. 4 at 0:01:12 – 0:01:15).  The officer and Jackson discussed

Jackson's handcuffs and the need to use two sets of handcuffs for Jackson's comfort.  (G. Ex. 4

at 0:01:15 – 0:01:22).  They also discussed Jackson's GPS monitor and whether to remove it.

(G. Ex. 4 at 0:01:27 – 0:01:38).

    After the shackles were removed, Jackson got out of Richards's vehicle and

approached Pepin.  (G. Ex. 4 at 0:02:07).  He asked Pepin, "Before we leave, can I just tell my

lady I love her, please?  I'm not going to see her for awhile."  (G. Ex. 4 at 0:02:08 – 0:02:12

(hereinafter, "Statement Four")).  He was told that his girlfriend was also going to be transported

to the Public Safety Building.  (G. Ex. 4 at 0:02:12 – 0:02:20).  A few moments later, Jackson

repeatedly told someone (possibly his girlfriend, although the identity of the individual is

unclear) to "stop crying" (G. Ex. 4 at 0:02:30 – 0:02:53 (hereinafter, "Statement Five")).

Approximately one minute later, Jackson instructed someone to "take pictures of his kids" and to

make sure they are "happy" (G. Ex. 4 at 0:03:50 – 0:04:13 (hereinafter, "Statement Six")).

## IV. **Jackson's Affidavit**

    Jackson submitted an affidavit in support of his suppression motions.  (Docket

# 17-1).  He represented that he lived at 100 Tremont Circle with his wife and that on December

24, 2020, he reported to the parole office at Richards's direction.  (*Id.* at ¶¶ 2, 3, 12).  At the

parole office, Jackson was asked where he had been the previous day.  (*Id.* at ¶ 4).  He was

handcuffed and shackled and believed that he was not free to leave.  (*Id.* at ¶¶ 5-6).

    According to Jackson, officers attempted to place him in the back of a parole

truck but had difficulty doing so.  (*Id.* at ¶¶ 7-8).  Jackson observed another parole vehicle

"speed" by, presumably to attempt to reach Jackson's residence before his wife did.  (*Id.* at ¶ 8).

Jackson was driven to his residence in a parole vehicle.  (*Id.* at ¶ 9).  Jackson overheard on the

car's radio that parole officers were searching his residence.  (*Id.* at ¶ 10).

Jackson represented that he was never advised of his *Miranda* rights.  (*Id.* at ¶ 13).

## REPORT & RECOMMENDATION

I.    <u>Dismissal of Counts Two or Three</u>

   A.    <u>Multiplicity</u>

Jackson moves to dismiss Count Two, or in the alternative Count Three, of the indictment on the grounds that the counts are multiplicitous because they both charge possession of fentanyl with intent to distribute.  (Docket # 17 at ¶¶ 24-26).[3]  Count Two charges Jackson with possession of fentanyl with intent to distribute, and Count Three charges Jackson with possession of fentanyl, methamphetamine, and ANPP with intent to distribute.  (Docket # 24). The government maintains that the charges are not multiplicitous because Count Two requires proof that some of the quantities contained fentanyl, while Count Three requires proof that some of the quantities contained a mixture of fentanyl, methamphetamine, and ANPP.  (Docket # 19 at 12-13).

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999) (citing *United States v. Holmes*, 44 F.3d 1150, 1153-54 (2d Cir. 1995)).  A multiplicitous charge risks violating the Double Jeopardy Clause of the Fifth Amendment by punishing a person for the same crime more than once.  *See United States v. Dixon*, 509 U.S. 688, 696 (1993).  "When . . . the same statutory violation is

---

[3]  Jackson filed his motion to dismiss before the grand jury returned the superseding indictment.  (Docket ## 17, 24).  Count Two of the original indictment charged Jackson with possession of fentanyl with intent to distribute, and Count Three charged him with possession of fentanyl and methamphetamine with intent to distribute. (Docket # 1).  In the superseding indictment, Count Two remains unchanged, but Count Three was modified to charge him with possession of fentanyl, methamphetamine, and ANPP with intent to distribute.  (Docket # 24). During oral argument, Jackson's attorney confirmed that he persists in his contention that Counts Two and Three of the superseding indictment are multiplicitous.  (Docket # 28 at 114).

charged twice, the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution."[4] *United States v. Ansaldi*, 372 F.3d at 124 (citing *Bell v. United States*, 349 U.S. 81, 83-84 (1955)).

The double jeopardy concerns implicated by multiplicitous counts do not arise unless and until a defendant is actually convicted of, rather than charged with, multiplicitous counts. *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) ("[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed"); *United States v. Medina*, 2014 WL 3057917, *3 (S.D.N.Y. 2014) ("since *Josephberg*, courts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature"). Accordingly, Jackson's motion is premature at this stage. Moreover, any risk of multiplicity may be addressed through an appropriate instruction to the jury.

"The Second Circuit has made it clear that separate counts may be charged under 21 U.S.C. § 841(a) for a single act of possession with intent to distribute multiple types of drugs." *United States v. Rodriguez*, 2009 WL 274145, *1 (S.D.N.Y. 2009); *see United States v. DeJesus*, 806 F.2d 31, 36 (2d Cir. 1986) (upholding cumulative sentences for Section 841 convictions arising out of possession of heroin and cocaine), *cert. denied*, 479 U.S. 1090 (1987); *see also Ansaldi*, 372 F.3d at 126 n.5 ("the general rule is that a defendant can be punished for two violations of 21 U.S.C. § 841 arising from one act of possession or distribution of multiple

---

[4] To determine whether an indictment impermissibly charges a defendant more than once for the same conduct, courts often apply a test from *Blockburger v. United States*, 284 U.S. 299 (1932), which "examines whether each charged offense contains an element not contained in the other charged offense." *United States v. Chacko*, 169 F.3d at 146. That analysis is inapplicable here because the issue is not whether one act is covered by two statutes, but whether the defendant's alleged conduct may give rise to two charges under the same statute. *See United States v. Ansaldi*, 372 F.3d 118, 125 n.3 (2d Cir.), *cert. denied*, 543 U.S. 949 (2004), *abrogated on other grounds by McFadden v. United States*, 576 U.S. 186 (2015).

controlled substances"). As the Court understands, the government represents that several quantities of controlled substances were seized from Jackson's residence, some of which contained a mixture of fentanyl and methamphetamine and others of which contained a mixture of fentanyl, methamphetamine, and ANPP. Under these circumstances, the charges do not appear to be multiplicitous. *See United States v. Rodriguez*, 2009 WL 274145 at *1 (conviction of two counts of distributing pills containing a mixture of cocaine and heroin not multiplicitous because they involved two different drugs).

For these reasons, I recommend denial of Jackson's motion to dismiss either Count Two or Count Three as multiplicitous.

**B.    Double Jeopardy**

Jackson also seeks dismissal of the indictment on the grounds of double jeopardy, *res judicata*, and issue and claim preclusion, maintaining that a state grand jury considered charges arising out of the same facts but concluded that insufficient evidence existed to indict. (Docket # 17 at ¶¶ 57-59). Jackson's arguments lack merit. As an initial matter, the Double Jeopardy Clause is inapplicable. Jeopardy does not attach "until the jury has been empaneled and sworn, and is thus competent to dispense a judgment of guilt." *United States v. White*, 980 F.2d 836, 842 (2d Cir. 1992); *see Crist v. Bretz*, 437 U.S. 28, 38 (1978) ("jeopardy attaches when the jury is empaneled and sworn"). Here, no trial jury was ever empaneled in connection with the state court prosecution and jeopardy never attached. *See United States v. Brown*, 634 F. App'x 806, 809 (2d Cir. 2015) (summary order) ("jeopardy does not attach until the trial 'jury is empaneled and sworn'") (quoting *United States v. Razmilovic*, 507 F.3d 130, 136 (2d Cir. 2007)); *United States v. Nova*, 478 F. Supp. 3d 87, 93 (D. Mass. 2020) (denying dismissal of federal indictment after dismissal of state prosecution for same offense before trial jury

14

empaneled; "[b]ecause a jury was never empaneled and sworn, jeopardy never attached in

[defendant's] state case and thus the instant federal prosecution does not constituted a successive

prosecution under the Double Jeopardy Clause"); *Tiller v. Gale*, 2007 WL 2990558, *4 (D. Kan.

2007) ("the failure of a grand jury to return an indictment is not at all like [an] acquittal . . . ;

double jeopardy has not attached and the failure to return a true bill has no preclusive effect");

*United States v. Salmon*, 504 F. Supp. 1270, 1273 (S.D. Tx. 1981) ("[r]e-indictment for the same

offense by a subsequent [g]rand [j]ury does not involve the bar of double jeopardy unless the

trial of the original indictment has ended in such a way that jeopardy has attached"); *see also*

*United States v. Williams*, 504 U.S. 36, 49 (1992) ("[t]he Double Jeopardy Clause of the Fifth

Amendment does not bar a grand jury from returning an indictment when a prior grand jury has

refused to do so").

        In any event, "[a]s the Supreme Court recently reaffirmed, the 'dual-sovereignty'

doctrine holds that 'a State may prosecute a defendant under state law even if the Federal

Government has prosecuted him for the same conduct under a federal statute." *United States v.*

*Nyenekor*, 784 F. App'x 810, 813 (2d Cir. 2019) (summary order) (quoting *Gamble v. United*

*States*, 139 S. Ct. 1960, 1964 (2019)), *cert. denied*, 141 S. Ct. 301 (2020).  The dual-sovereignty

doctrine "also applies to the reverse situation: the federal Government may prosecute a defendant

if he has already been prosecuted by the state." *Id.*  Accordingly, even if jeopardy had attached

in the state proceedings, the federal government would not be barred from pursuing federal

charges. *See id.*; *see also United States v. Johnson*, 852 F. App'x 559, 563 (2d Cir. 2021)

(summary order) ("[defendant's] previous prosecution by a state government . . . could not bar

prosecution by a different party, the federal government"); *United States v. Burden*, 600 F.3d

204, 229 (2d Cir.) ("[u]nder the dual sovereignty principle, a defendant may be prosecuted for

the same conduct by more than one sovereign without offending the Double Jeopardy Clause because breaking the laws of each constitutes separate offenses[;] . . . [s]tate and federal governments are separate sovereigns in this analysis") (citation omitted), *cert. denied*, 562 U.S. 953 (2010); *United States v. McCaskill*, 378 F. Supp. 2d 114, 117-18 (E.D.N.Y. 2005) ("defendant contends that because a New York State Grand Jury failed to initially indict him . . . , the court is now precluded from finding him guilty of these charges[;] . . . the New York State Grand Jury and the United States District Court are two different entities whose powers are derived from two different sovereigns[;] [t]he Double Jeopardy Clause, therefore, is not implicated").

Finally, to the extent that Jackson argues that this prosecution is barred by principles of collateral estoppel, such claim is equally unavailing.  Under the doctrine of collateral estoppel, "a non-party to an action can be bound by the determination of issues decided in that action if it 'controls or substantially participates in the control of the presentation on behalf of a party.'"  *United States v. Davis*, 906 F.2d 829, 833 (2d Cir. 1990) (quoting Restatement (Second) of Judgments § 39 (1982)).  Although the Second Circuit has recognized the applicability of collateral estoppel in criminal cases, it has also observed that the fact that the state and federal governments are not just different parties, but different sovereigns, generally forecloses the use of collateral estoppel to bar a second prosecution except in "the most unusual circumstances."  *Id.*; *see United States v. Peterson*, 100 F.3d 7, 12 (2d Cir. 1996) ("criminal collateral estoppel, a relative of double jeopardy, . . . generally may not be invoked against one sovereign on the basis of a ruling in a prosecution brought by a different sovereign") (citation omitted).  The pivotal question is whether there was a "significant relationship" between the state and federal prosecutors such that the federal sovereign's interest could be said to have been

represented during the state court proceeding.  *United States v. Davis*, 906 F.2d at 834.  Here, Jackson has offered no evidence to suggest that federal prosecutors were in any way involved in his state court prosecution, and thus the United States cannot be said to have had its day in court. On this record, I recommend denial of Jackson's motion to dismiss the indictment on the grounds of double jeopardy, *res judicata*, and issue and claim preclusion.

## II.    <u>Suppression of Evidence</u>

Jackson seeks to suppress all evidence seized during the warrantless search of his residence on December 24, 2020.  (Docket ## 17, 32).  Jackson maintains that the parole officers did not have an articulable reason to search his residence because they lacked any information to suggest that contraband would be found inside.  (Docket # 32 at 5-9).  According to Jackson, because he had already admitted to technical violations of his parole conditions and Richards had no basis to disbelieve Jackson's admissions, "[t]he search of his residence amounted to nothing more than a mere fishing expedition."  (*Id.* at 9).  The government counters that Richards did not need an articulable basis or reasonable suspicion to search Jackson's residence so long as the search was reasonably related to Richards's supervisory duties.  (Docket # 35 at 13-16).  In the government's estimation, reasonable suspicion existed to justify the search in any event.  (*Id.* at 16-19).  Additionally, the government contends that Jackson consented to the search.  (*Id.* at 18 n.2).

The Fourth Amendment generally prohibits law enforcement officers from conducting a warrantless search or seizure of a defendant's residence or property, *see* U.S. Const. amend. IV; *United States v. Place*, 462 U.S. 696, 701 (1983) ("seizure of personal property [is] per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished

pursuant to a judicial warrant"), and "[i]t is beyond dispute that a parolee's home, 'like anyone

else's, is protected by the Fourth Amendment's requirement that searches be reasonable,'" *see*

*United States v. Braggs*, 5 F.4th 183, 186 (2d Cir. 2021) (quoting *Griffin v. Wisconsin*, 483 U.S.

868, 873 (1987)).  "[W]hether a search is reasonable 'is determined by assessing, on the one

hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to

which it is needed for the promotion of legitimate governmental interests.'"  *Samson v.*

*California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118-19

(2001)).  To determine whether a defendant possessed a reasonable expectation of privacy, the

court must first consider whether the defendant exhibited an actual expectation of privacy and,

second, whether that expectation is one that society is prepared to recognize as reasonable.  *Katz*

*v. United States*, 389 U.S. 347, 361 (1967) (Harlan J., concurring); *see California v. Ciraolo*, 476

U.S. 207, 213 (1986) (analyzing reasonableness of expectation of privacy under *Katz* two-prong

test).

       "[B]y virtue of their status alone," individuals on parole, probation, or supervised

release "have severely diminished expectations of privacy."  *See United States v. Barner*, 666

F.3d 79, 84 (2d Cir. 2012) (quoting *Samson v. California*, 547 U.S. at 850, 852 ("parolees have

fewer expectations of privacy than probationers, because parole is more akin to imprisonment

than probation is to imprisonment")); *see also United States v. Knights*, 534 U.S. at 119-20

(probationer's reasonable expectation of privacy is less than that of an ordinary citizen); *United*

*States v. Elder*, 805 F. App'x 19, 21 (2d Cir. 2020) (summary order) ("[p]ersons on supervised

release have a diminished expectation of privacy"), *cert. denied*, 141 S. Ct. 1055 (2021); *United*

*States v. Massey*, 461 F.3d 177, 179 (2d Cir. 2006) ("[a] parolee's reasonable expectations of

privacy are less than those of ordinary citizens and are even less so where, as here, the parolee,

as a condition of being released from prison, has expressly consented to having his residence searched by his parole officer") (citations omitted), *cert. denied*, 549 U.S. 1136 (2007); *United States v. Reyes*, 283 F.3d 446, 458 (2d Cir.) (holding that individuals on federal supervised release have diminished Fourth Amendment protections), *cert. denied*, 537 U.S. 822 (2002); *United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) ("parole justifies some departure from traditional Fourth Amendment standards"). Individuals on parole have even more diminished expectations of privacy than those on probation. *See United States v. Braggs*, 5 F.4th at 187 n.3 ("parolees have fewer expectations of privacy than probationers") (internal quotations omitted). Comparatively speaking, "[s]upervised release, parole, and probation lie on a continuum," *United States v. Lifshitz*, 369 F.3d 173, 181 n.4 (2d Cir. 2004), and "[t]he most severe is 'supervised release,' which is 'meted out in addition to, not in lieu of, incarceration[;] . . . followed, in descending order, by parole, then probation," *id.* (quoting *United States v. Reyes*, 283 F.3d at 461). An individual's "expectation of privacy is further diminished where he has consented to a search condition." *United States v. Jackson*, 663 F. App'x 31, 33 (2d Cir. 2016) (summary order).

"The Supreme Court has acknowledged the need for exceptions to the warrant and probable cause requirements of the Fourth Amendment where an administrative agency has 'special needs, beyond the normal need for law enforcement.'" *Reyes*, 283 F.3d at 461 (quoting *Griffin v. Wisconsin*, 483 U.S. at 873 ("[a] state's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements"). Pursuant to the "special needs doctrine," courts have recognized the government's "overwhelming" interest in closely monitoring individuals on probation, parole and supervised release. *Samson*, 547 U.S. at 853 ("[t]his Court has repeatedly

acknowledged that a State has an overwhelming interest in supervising parolees because parolees are more likely to commit future criminal offenses[;] [s]imilarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment") (internal quotation and citations omitted); *United States v. Newton*, 369 F.3d 659, 665 (2d Cir.) ("[r]elying on the 'special needs' exception . . . , this court has ruled that operation of a parole system also presents special needs justifying a departure from the traditional Fourth Amendment warrant requirement") (emphasis omitted), *cert. denied*, 543 U.S. 947 (2004); *Reyes*, 283 F.3d at 462 ("[t]he overwhelming interest in ensuring that a parolee complies with parole requirements . . . also exists in full measure with respect to a convicted person serving a term of federal supervised release") (internal quotations and brackets omitted).

"[P]arole officers have a duty 'to investigate whether a parolee is violating the conditions of his parole, … one of which, of course, is that the parolee commit no further crimes.'" *United States v. Barner*, 666 F.3d at 85 (quoting *Reyes*, 283 F.3d at 459); *United States v. Lambus*, 897 F.3d 368, 404 (2d Cir. 2018) ("[o]ne aspect of the parole officer's duty thus includes an obligation to detect and to prevent parole violations for the protection of the public from the commission of further crimes") (internal quotations omitted).  In order to perform these duties, parole officers "of necessity, must have investigative powers to gather information about the parolee's activities, environment, and social contacts so as to ensure that the conditions of parole are not being violated and to monitor the parolee's progress of reintegration into society." *Reyes*, 283 F.3d at 458 (internal quotations and brackets omitted). Considering the weighty interests in ensuring compliance with release conditions, courts have

concluded that searches that may be unreasonable as to ordinary citizens may be reasonable as to paroleees.  *See Barner*, 666 F.3d at 83-84 ("[i]n the context of parole and probation, the Supreme Court has explained that . . . 'special needs beyond normal law enforcement . . . may justify departures from the usual warrant and probable-cause requirements'[;] [a]s a result, 'probationers may be subject to a degree of impingement upon privacy that would not be constitutional if applied to the public at large'") (quoting *Griffin*, 483 U.S. at 873, *and United States v. Grimes*, 225 F.3d at 258)).

The parties do not dispute that the probable cause requirement of the Fourth Amendment does not apply to the search of Jackson's residence.  Although they agree that a lesser standard is applicable, they disagree about which standard applies.  Jackson maintains that the applicable inquiry is "articulable reason," while the government contends that the applicable inquiry is the special needs standard.  Jackson's position was squarely rejected by the Second Circuit in *United States v. Braggs*, which held that a search of a parolee's residence is constitutionally permissible so long as it is "reasonably related to the performance of the [parole] officers' duties" and does not need to be supported by reasonable suspicion.  5 F.4th at 188; *see generally United States v. Alfaro*, 2022 WL 4287664, *6-8 (W.D.N.Y. ) (discussing *Braggs* in the context of a supervised release search), *report and recommendation adopted by*, 2022 WL 3499684 (W.D.N.Y. 2022).

I easily conclude that the search of Jackson's residence was reasonably related to Richards's supervisory duties.  Richards testified that the decision to conduct the search was made after learning information suggesting that Jackson had committed several violations of his parole conditions, including failing to report to the parole office, staying out past curfew, traveling out of his parole-approved area, and tampering with his GPS monitor.  According to

Richards, although Jackson had admitted to traveling to New York and tampering with his GPS, his duties required him to fully investigate the violations in order to determine "what these events mean[t]" and whether to "mov[e] forward with a violation process or not." (Tr. 45-46).

Indeed, it was reasonable to believe that a search of Jackson's residence would uncover evidence that would either corroborate or undermine Jackson's proffered explanation for his travels – that he went to New York City to purchase a necklace to give to his girlfriend on Christmas. Because he lived with his girlfriend and the holiday was the following day, the necklace likely would have been in the residence if Jackson had been telling the truth. Its absence, by contrast, likely would undercut the credibility of Jackson's explanation. In addition, it was reasonable to think that relevant documentation, such as sales, toll, or gas receipts, might also have been in the residence.

Richards testified that, based upon his experience, Jackson's violations, including the deceptive act of masking the GPS monitor, led him to suspect that contraband might be located inside the residence. According to Richards, he believed that a search of the residence thus would assist the parole officers in deciding whether Jackson should be violated for failing to comply with his conditions. Under these circumstances, I find that the search of Jackson's residence was reasonably related to Richards's duties, was "permissible under the Special Needs framework[,] and accordingly comport[ed] with the Fourth Amendment." *See Braggs*, 5 F.4th at 188 (internal quotations and brackets omitted); *Barner*, 666 F.3d at 85 (search was reasonably related to parole officer's duties where it "was performed in direct response to information that [the officer] obtained and that she had a duty to investigate further"); *United States v. Nazario*, 374 F. App'x 63, 65 (2d Cir. 2010) (summary order) (search reasonably related to parole officers' duties; "[t]he parole officers who conducted the search did so after determining that

[defendant] had likely committed two parole violations: he was not in his home after his . . . curfew, and, when he did arrive home, he appeared to be under the influence of drugs"); *United States v. Turner*, 2021 WL 8055692, *4 (S.D.N.Y. 2021) ("[f]ar from arbitrary, capricious, or harassing, here the decision to search defendant's apartment was made by [the parole officer and his supervisors] after viewing a video showing their parolee brandishing a gun[;] . . . after viewing the video of its parolee with a gun in his hand, [p]arole would have been derelict in its duty if it failed to search defendant's apartment"). In reaching this determination, I disagree with Jackson's assertion that the search of the residence was not reasonably related to the parole officers' duties because parole had sufficient information absent a search to establish that Jackson had violated several conditions. *See United States v. Nazario*, 2005 WL 2234036, *3 (S.D.N.Y. 2005) (rejecting defendant's argument that search was unreasonable because "at that point, the [parole] officers had every reason to arrest him and take him to the precinct, and a search of his home was not necessary[;] . . . [t]he [c]ourt finds that the officers' decision to take [d]efendant back to his apartment instead of taking him to the precinct was reasonable"), *aff'd*, 374 F. App'x 63 (2d Cir. 2010).

Even if Richards were required to have had an "articulable reason" to conduct the search of Jackson's residence, the circumstances described above provided sufficient reasonable suspicion to conduct the search in order to determine whether and the extent to which Jackson had violated the conditions of his parole, including the condition that he not engage in criminal activity. Moreover, Jackson's conduct in alerting his girlfriend of the imminent parole search of the residence further supports the reasonable suspicion that contraband might have been present in the residence. *See United States v. Harrison*, 2016 WL 11481716, *6 (E.D.N.Y.) (defendant's deceitful and evasive conduct and nervous demeanor relevant to "establish reasonable suspicion

to believe that [d]efendant was engaged in criminal activity that he wished to hide from the probation officers"), *report and recommendation adopted by*, 2016 WL 1070816 (E.D.N.Y. 2016). I find that the totality of the circumstances known to Richards presented sufficient grounds to justify the search of the residence. *See United States v. Bazemore*, 2021 WL 1719233, *2 (S.D.N.Y. 2021) ("reasonable suspicion requirement may be satisfied where an officer has knowledge of allegations that would constitute parole violations"); *United States v. Coulombe*, 2007 WL 4192005, *5 (N.D.N.Y. 2007) ("[w]hile no single factor is dispositive [in determining reasonable suspicion], courts have sometimes focused on certain factors that are especially probative, including a suspect's: lies and false information; implausible, conflicting, evasive or unresponsive answers; and nervous behavior or demeanor"); *see also United States v. Justiniano*, 401 F. App'x 595, 596 (2d Cir. 2010) (summary order) ("the clear parole violations observed by the officers here upon entering [the defendant's] residence provided sufficient reasonable suspicion to conduct a further search for additional contraband") (internal quotation omitted).[5]

## III.   **Suppression of Statements**

Jackson seeks to suppress the statements he made on December 24, 2020, on the grounds that they were the product of unwarned custodial interrogation. (Docket ## 17 at ¶¶ 49-51; 32 at 3-5). In opposition, the government concedes that Jackson was in custody and was not advised of his *Miranda* rights and represents that it will not seek to introduce any statements Jackson made during the interview in the parole office. (Docket # 35 at 20 n.3). The government seeks, however, to reserve the right to seek admission of the six statements

---

[5] Because I find that suppression is not warranted, I do not reach the government's alternative argument that Jackson consented to the search. (Docket # 35 at 18 n.2).

identified *supra*, maintaining that they were spontaneous and not the product of interrogation. (Docket # 40 at 5-10). Jackson requests suppression on the grounds that they were the tainted fruit of the custodial interrogation at the parole office. (Docket # 37). He also maintains that Statements Two and Three were the product of unwarned interrogation at the time of the search. (*Id.* at 3).

In its original post-hearing submission, the government identified only the first four statements as those that it would seek to introduce. (Docket # 35 at 20). Thus, in its post-hearing submission, Jackson addressed only those statements. (Docket # 37). Despite that, in its supplemental submission made in response to this Court's order directing further briefing (Docket # 36), the government indicated for the first time that it would also seek to introduce Statements Five and Six. (Docket # 40 at 10). Because the government failed to identify those statements in its original submission, I recommend that the government not be permitted to offer Statements Five and Six.

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

"Law enforcement must issue *Miranda* warnings when a subject is both 'in custody' and under 'interrogation' by police officers." *United States v. Lightbourn*, 357 F. App'x 259, 265 (11th Cir. 2009) (per curiam), *cert. denied*, 560 U.S. 917 (2010). No dispute exists that Jackson was in custody at the time he made the identified statements; instead, the dispute concerns whether Jackson made the statements as a result of interrogation by Richards or other law enforcement.

Not every statement made to a police officer by an individual who is in custody is necessarily the product of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). For example, statements made spontaneously by a defendant are generally exempted from the *Miranda* requirements because they are not the result of deliberate elicitation by the officers. *See Rhode Island v. Innis*, 446 U.S. at 299-300. As the Supreme Court has explained:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478; *see also Innis*, 446 U.S. at 299-300. In other words, unsolicited statements made by a person voluntarily and freely will generally be admissible, irrespective of whether *Miranda* warnings were administered. *See Innis*, 446 U.S. at 299-300; *see United States v. Lightbourn*, 357 F. App'x at 265. In addition, "statements that are voluntary and unresponsive to the questions posed are not protected by *Miranda*." *Lightbourn*, 357 F. App'x at 265.

Interrogation is not limited to "express questioning"; rather, it extends to the "functional equivalent" of questioning, namely, "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (summary order) (quoting *Innis*, 446 U.S. at 300-301). "Law enforcement officers are not to be held 'accountable for the unforeseeable results of their words or actions,' nor does police conduct 'qualify as interrogation simply because it struck a responsive chord in a defendant.'" *United States v. Davis*, 2011 WL 2936123, *8 (W.D.N.Y.) (quoting *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009)), *report and recommendation adopted by*, 2011 WL 5570707 (W.D.N.Y. 2011). "Although an officer's intent is relevant, it is not conclusive; rather, the inquiry 'focuses primarily upon the perceptions of the suspect.'" *Id.* (quoting *Innis*, 446 U.S. at 301). The Second Circuit has reaffirmed that the determination whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response should be made upon "the totality of the circumstances." *United States v. Broughton*, 600 F. App'x at 783. (quoting *Acosta v. Artuz*, 575 F.3d at 191).

I find, for the reasons explained below, that Statements One, Two, and Four were not elicited in response to police interrogation and thus should not be suppressed because they were not preceded by *Miranda* warnings.[6] Beginning with Statement One – Jackson's multiple alerts to his girlfriend that parole officers were traveling to the residence – I conclude that although the statements were made directly after the custodial parole interview, they were

---

[6] Because I conclude that these statements were spontaneous rather than the result of interrogation, the deliberate two-step interrogation analysis articulated in *Missouri v. Seibert*, 542 U.S. 600 (2004) and its progeny, is inapplicable.

27

nonetheless spontaneous and not made in response to questions posed by Richards. As an initial matter, they were made to Jackson's girlfriend, not to Richards. Further, Richards repeatedly asked Jackson to stop alerting his girlfriend to the imminent search of the residence. Under these circumstances, I find that the statements to his girlfriend were spontaneous and should not be suppressed. *Medeiros v. Shimoda*, 889 F.2d 819, 824 (9th Cir. 1989) (defendant's initial incriminating statement inadmissible because it directly responded to police questioning; subsequent statement on same subject matter spontaneous where made after arrest and booking and where police engaged in no further questioning), *cert. denied*, 496 U.S. 938 (1990); *United States v. Fautz*, 812 F. Supp. 2d 570, 646 (D.N.J. 2011) (rejecting "defendant's contention that his statements during the transport ride should be excluded as part of a continuing violation stemming from the original inadmissible pre-arrest statement" because "[c]ourts have not condoned any general concept of a continuing Fifth Amendment violation to exclude allegedly spontaneous statement"); *United States v. Daniels*, 2010 WL 2163844, *4 (E.D. Pa. 2010) (unsolicited inculpatory statements made in temporal proximity to *Miranda* violation, in the same location, and to the same officers not suppressed because they were not the result of interrogation by police); *United States v. Barnes*, 2005 WL 1899502, *4 (E.D. Pa. 2005) (fact that officer initially questioned in-custody defendant concerning presence of contraband did not mandate suppression of defendant's subsequent statement about contraband to the same officer within temporal proximity to officer's previous question).

I reach a similar conclusion with respect to Statement Four, made to Pepin just prior to Jackson's transportation to the Public Safety Building. This statement was made several hours after the unwarned parole interview and did not respond to any questions posed by law enforcement. Rather, the statement represented Jackson's unprompted request to speak to his

girlfriend prior to the drive.  I conclude that this statement was spontaneous and should not be suppressed.

Statements Two and Three present a closer question.  Statement Two was uttered by Jackson during the course of his general conversation with Richards.  It followed an exchange between Richards and another parole officer concerning the need for RPD at the residence and Richards's response to Jackson's inquiry about its significance.  A search-related discussion between law enforcement officers generally does not amount to interrogation.  *See United States v. Jones*, 2013 WL 4541042, *8 (W.D.N.Y. 2013) (finding defendant's statement to be spontaneous despite officer's discussion of discovery of firearm; "[t]his was an exchange between law enforcement officers that is to be expected during the execution of a search warrant and was neither evocative nor a psychological ploy designed to induce [the defendant] to make a statement of any kind").  Nor do I find that the statement was unlawfully induced by Richards's explanation concerning RPD's response to a parole search.  Rather, Jackson's statement that Richards "got him" was volunteered by Jackson.  *See United States v. Smith*, 215 F. App'x 255, 258 (4th Cir. 2007) (defendant's statement concerning ownership of guns seized from house not made in response to previous question by officer concerning whether "there was anything in the house he needed to know about"; because statement was volunteered by defendant, it was admissible); *United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir. 1984) (finding defendant's statement "spontaneously volunteered" where it was made in response to police questions but was wholly unresponsive to question posed by officer); *United States v. Thomas*, 961 F. Supp. 43, 45-46 (W.D.N.Y. 1997) (defendant's second statement was unsolicited, spontaneous and voluntary where initial statement was made in response to police question and subsequent statement was non-responsive to officer's question; "single inquiry about the genesis of the

altercation was, under all the circumstances, not calculated to induce an admission as to [defendant's] intent"); *see also Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir.) (defendant's statement concerning when he had dyed his hair was offered "voluntarily and outside the scope of the question" about defendant's natural hair color), *cert. denied*, 546 U.S. 889 (2005).

By contrast, Richards's direct response to Jackson – "what do you mean" – was reasonably likely to elicit an incriminating statement. Indeed, Richards testified that Jackson's statement purportedly accepting responsibility for "whatever was found in the apartment" was "important" because it suggested Jackson's knowledge that something incriminating was inside the apartment. Because Jackson was in custody at the time and had not been provided *Miranda* warnings, I recommend that the district court suppress Statement Three.

## **CONCLUSION**

For for the reasons stated above, I recommend that the district court deny Jackson's motions to dismiss and to suppress physical evidence and deny in part and grant in part Jackson's motion to suppress statements. (Docket ## 17, 32, 37). Specifically, I recommend that the district court grant Jackson's motion to suppress statements made during the custodial parole interview and Statements Three, Five, and Six identified herein; I recommend that the district court deny Jackson's motion to suppress Statements One, Two, and Four identified

herein.  With respect to Jackson's motion to suppress identification evidence (Docket # 17 at

¶¶ 52-54), as discussed *supra* at note 1, I recommend that the motion be denied as moot.


                                        *s/Marian W. Payson*
                                        MARIAN W. PAYSON
                                        United States Magistrate Judge

Dated: Rochester, New York
       October 31, 2022

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59 of the Federal Rules of Criminal Procedure.[7]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                    *s/Marian W. Payson*
                                    MARIAN W. PAYSON
                           United States Magistrate Judge

Dated: Rochester, New York
       October 31, 2022

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).